## W. C. HARRELL v. THE STATE.

### No. 1432. Decided April 27, 1898.

**1.  Murder—Evidence—Acts, Declarations, and Conduct of Defendant—Res Gestae.**

On a trial for murder, where defendant's wife as a witness had testified that about two months before the killing, as she and defendant were returning from church in a wagon, they came in sight of deceased and two other parties, with guns, ahead on the road they were traveling, and that they turned round, went back, and defendant borrowed a horse to ride home; and the court refused to permit the wife to state, in this connection, that her husband stated that he would go home another way to avoid the deceased. Held, the exclusion of the testimony was correct, the acts and declarations of the defendant at that time being no part of the res gestae of the' homicide. The admission of testimony to the fact that when he came in sight of deceased he did turn round, borrow a horse, and go home in another direction, rendered the exclusion of the proposed statement of defendant harmless in any aspect of the matter.

**2.  Same—Communicated Threats—Irrelevant Declarations of Defendant.**

On a trial for murder, where after it was testified by one of defendant's witnesses that some time before the homicide he had communicated to defendant deadly threats by deceased against him, and that deceased was hunting for a gun to kill him, it was not error to refuse to permit said witness to further testify that defendant said he would go to see the sheriff, and if he could get off as a witness in a case upon which he was in attendance he would go home, because he did not want to meet deceased or have any trouble with him. The declarations of defendant were no part of the threats, and only showed apprehension on his part long before the homicide.

**3.  Same—Excluded Evidence.**

An offer to prove by the sheriff, in connection with the matter as stated above, that defendant came to him, stated the threats of deceased, asked that he might be released as a witness and permitted to go home, and that the sheriff did excuse him, whereupon defendant went home to avoid meeting deceased, was properly excluded by the court for the same reasons as stated in paragraph 2, supra.

**4.  Same.**

Evidence that defendant had requested the sheriff to be present and keep down trouble at a trial which was to take place on the day the homicide occurred, which trial was a prosecution by deceased against defendant; and that he had stated to the sheriff at the time that he did not want any trouble with deceased, and that he expected to sell out and leave the country to keep from being further troubled with deceased, as soon as he was through with the case, was properly excluded; the acts and declarations not being in any sense admissible as res gestae, and where they could have no bearing on the issue of self-defense.

**5.  Same.**

Evidence as to what defendant said when informed of the threats of deceased against him, as showing the condition of his mind at the time of the homicide and in support of his claim of self-defense, was properly excluded, where it was shown that the deceased was unarmed at the time of the homicide and did nothing indicating a hostile purpose towards defendant.

**6.  Same—Threats Communicated—Declarations of Defendant.**

There is no rule which authorizes proof to be made of what a party may have said about threats communicated to him.

**7. - Same—Examination of Witness by the Court—Bill of Exceptions.**

Where a witness had testified to certain threats made by deceased, which he said he had not communicated to defendant, and the court asked him why he did not communicate them to defendant, and he replied, "because he thought it might make things worse;" and the court then said, "You did tell him?" and he answered "Yes;" and the court then asked, "Did it make things worse?" and the witness

answered "Yes." Held, the bill of exceptions is defective in not stating what the threats were and in what respect they made "things worse," in the opinion of the witness.

**8. Same—Examination of Witness by the Court.**

Where the court asked a witness if he had ever seen defendant with a pistol, and witness answered "Yes," and it was objected that this was an inquiry into defendant's character, which he had not put in issue; Held, not so; and moreover, the defendant being a constable and having a right to carry a pistol, the question and answer could in no manner have been injurious.

**9. Same.**

If it be conceded that the method of the court in the examination of a witness was improper, yet, unless it be shown that such examination resulted in injury to the defendant, it will not constitute reversible error. And where the effect of the examination of the court was only to bring out in bolder relief a fact testified to by a witness, it is not injurious.

**10. Same.**

Though the court in the examination of a defendant's witness may have asked her questions which tended to discredit her, such examination can not be held injurious when the bill of exceptions fails to show that said witness had testified to anything material to defendant. The court will not presume that the witness was a material one.

**11. As to Examination of Witness by the Judge.**

See the opinion for a discussion in extenso of the right of the judge to interfere with and take upon himself the examination of witnesses, and where it is said: "Such interference on the part of a judge can never be called for, especially in a case where both the State and defendant are represented by able counsel," in which case it is absolutely unwarranted. And in any case, if it be made to appear to the court on appeal that such interference on the part of the judge was calculated to prejudice the rights of appellant, the court will not hesitate to reverse the case.

**12. Opinion Evidence—Harmless Error.**

On a trial for murder, where a State's witness was permitted to testify that just before the shooting, as he saw defendant approaching deceased, he, the witness, pulled his hat over his eyes, because he thought there would be trouble. Held, harmless, where it was shown that the whole community were looking for trouble between the two men when they met; and where the evidence is undisputed that the trouble did begin in a few seconds after the witness pulled his hat over his eyes.

**13. Witness—Refreshing Memory.**

Where a witness for defendant had testified that deceased reached for his pistol with his right hand, it was competent for the State on cross-examination, for the purpose of either refreshing his memory or laying a predicate to impeach him, to ask if he had not testified on the habeas corpus trial "that every one knew that deceased shot with his left hand?" the objection urged to the question being only that the question was irrelevant.

**14. Evidence—Communicated Threats—Witness' Statement that Deceased Was a Bad Man.**

Where a defendant witness had testified to threats made by a deceased against defendant, it was not error to refuse to permit her to state that in communicating the threats to defendant she also told him that deceased was a bad man and had killed some men.

**15. Impeachment of Witness—Charge.**

A charge of court as to the impeachment of a witness can rarely be called for,' and great care should be taken when such charge is given that is not on the weight of testimony. A failure to give such a charge is not error where the defendant has attempted to impeach a State's witness.

**16. Murder in the Second Degree—Self-Defense—Charge.**

Where, in connection with the charge on murder in the second degree, the court outlined a charge on self-defense, such charge could not be misleading where, subse-

quently, the court gave a full charge on self-defense covering the ground of objection urged to the said excerpt on self-defense in connection with murder in the second degree.

**17. Charge on Self-Defense.**

A charge on self-defense is not objectionable which is in accord with the facts of the case as presented by the testimony of defendant.

**18. Charge on Actual and Apparent Danger.**

An objection that the court failed to submit actual and apparent danger in separate instructions is not maintainable where it appears to be conceded that there was no actual danger, and the jury were fully authorized to accord a perfect right of self-defense on apparent danger.

**19. Erasures in Charge.**

An erasure of a portion of the charge is ordinarily made by drawing a pen across the clause intended to be erased, and is evidently so understood by the jury. Such an eliminated clause can not form the basis of complaint.

**20. Malice—Charge as to.**

A charge as to "malice" is sufficient which defines it as "a condition of the mind which shows a heart regardless of social duty and fatally bent on mischief, the existence of which is inferred from acts committed or words spoken." Following Martinez v. State, 30 Texas Criminal Appeals, 120.

**21. Charge—How Considered.**

A charge of court must be considered as a whole.

**22. Manslaughter—Charge.**

Where the issue of manslaughter was predicated upon insulting conduct towards defendant's wife, a charge is amply latitudinous and elaborate which, in addition to the particular provocation, instructs the jury that they could consider all the facts and circumstances in evidence in the case, "and if you find that by reason thereof the defendant's mind at the time of the killing was incapable of cool reflection, etc., then the proof as to the sufficiency of the provocation satisfies the requirements of the law; and so in this case, you will consider all the facts and circumstances in evidence in determining the condition of the defendant's mind at the time of the alleged killing and the adequacy of the cause, if any, producing such condition."

**23. Murder in the Second Degree—Evidence Sufficient.**

See opinion for facts summarized which the court holds amply sufficient to have warranted the jury in finding a severer verdict than they did.

APPEAL from the District Court of Frio, upon a change of venue from Atascosa County. Tried below before Hon. M. F. LOWE.

Appeal from a conviction for murder in the second degree; penalty, thirty years imprisonment in the penitentiary.

The indictment charged appellant with the murder of T. M. Peeler, by shooting him with a pistol, in Atascosa County, on the 18th day of May, 1897.

The record in this case is most voluminous, the statement of the facts in it covering seventy-seven printed pages of the transcript. A narrative of the important facts may, however, be briefly summed up as follows: Both the parties lived in the country some four and six miles distant from the village of Campbellton, in Atascosa County, the defendant being the constable of his precinct. During a term of the District Court at Pleasanton, the county site, and some months prior to the homicide, the deceased was talking to some friends in a saloon, and incidentally mentioned defendant's name in connection with some occurrence he was detailing. Defendant, who was sitting behind deceased, though his pres-

ence and proximity was unknown to the deceased, jumped up, and in a very angry manner rushed upon deceased, presenting a cocked pistol in his face with one hand while he struck him one or two blows with the other. Deceased told him he was unarmed. Defendant replied that he would not shoot an unarmed man, and it appears ·that he replaced his pistol in its scabbard. In the meantime deceased threw off his coat and vest and offered to fight him without weapons. At this they commenced fighting in the saloon, and the parties who were present all fled into the streets. The combatants fought out onto the gallery in front of the saloon, at which time defendant was beating deceased over the head with his sixshooter, and deceased was calling for protection from the officers of the county. He seems to have been badly beaten up in this rencounter, and was afterwards heard to make serious threats against the defendant. Some month or so afterwards deceased was arrested upon a complaint made by defendant, and perhaps some others, which complaint charged him (deceased) with the burning of the schoolhouse located upon or in the neighborhood of the lands belonging to the deceased. At this trial upon this accusation deceased was acquitted. After his acquittal he filed a complaint against the defendant for malicious prosecution; and this case was set down for trial before the justice of the peace at Campbellton for the afternoon of May 18th. Defendant, with several of his friends, reached Cambellton in the forenoon in a wagon and on horseback, having guns with them, defendant himself having a sixshooter buckled around him, which he had a right to carry, he being a constable. Deceased arrived on horseback about 2 o'clock, and hitched his horse close by where defendant's wagon had been stopped, and was seen by all the parties who were present in the village, and must have been seen more than once before the shooting by the defendant, as it appears that they on one or two occasions were in very close proximity to each other. Just before the shooting, the deceased and county attorney held an interview in an alley between two store buildings. The county attorney describes the clothing worn by the deceased, from which description it clearly appears that he could not have had a pistol upon his person, as anyone could have seen who had noticed him at all. Just as they had finished or were about to finish their conversation, the opening of the ·justice's court was announced by a special constable, the courtroom being in one of the storehouses which abutted upon the alley and but a few feet from where the parties had held the conversation above referred to. Some of the witnesses locate the defendant in a position where he must have seen deceased and the county attorney in conversation. As soon as the opening of court was announced, deceased started down the alley to go round in front of the courtroom, and defendant at the same time also started to the courtroom; and just as deceased had gotten upon or was about to step upon the sidewalk in front of the court building, defendant, who had approached him within eight or ten feet, drew his pistol and fired upon him, the ball entering the hat band of deceased and almost in the center of his forehead. The State's eyewitnesses testified, that at the time

the shot was fired deceased's hat was pulled down over his face and his head inclined a little forward, and that he did not make the slightest hostile demonstration, even if he knew or had seen that the defendant was near to him.  All the witnesses testify that not a word was spoken by either party before the shot.  Deceased fell and died in a very few seconds afterwards.  Defendant and some of his witnesses testified, that just before the defendant fired the deceased made a movement with his right hand towards his hip pocket, as though to draw a weapon.  The justice of the peace, county attorney, sheriff, and other officers testified, that they thoroughly searched the body of deceased and did not find even a pocket knife upon his person.  They also examined his saddle and saddle pockets, and found no weapon there.  The defense was self-defense, predicated upon threats and apparent danger; and manslaughter, predicated upon insulting language uttered a month or so before concerning and insulting conduct towards the wife of defendant several years before the homicide, but which his wife had only communicated to him the night before the homicide.

The matters pertaining to supposed errors to the admission and exclusion of evidence, and to the charge of the court, are sufficiently stated in the opinion of the court.

*Franklin & Cobbs, J. W. Hill, Jno. W. Preston, Jas. A. Walton,* and *Mason Maney,* for appellant.—The court erred in its holding upon the testimony of Mrs. Leah Harrell, witness for the defendant, in this: Mrs. Harrell testified that about two months before the killing, she and her husband and family went to church and the deceased was also there, and that after church, when she and her husband, the defendant, had started home in the wagon, the deceased and two other men, with guns, came in sight of them about one and a half miles from the church, across the country, going in the direction of the road, ahead of the wagon in which deceased and his wife were traveling, and that defendant, with witness, turned back and borrowed a horse from one Rountree, stating that he wanted to go home another way to avoid deceased.  The State moved the court then to exclude from the jury so much of said testimony as related to what witness said about borrowing a horse and going home, and the reasons why he borrowed the horse and went home, which motion of the State was granted by the court and said testimony excluded, over the objection of defendant that said testimony was admissible and should go to the jury in explanation of the conduct of the defendant, showing a desire on his part to avoid trouble with the deceased.

The court erred in refusing to permit the witness Jerd Campbell to testify as follows:  "That about the first week in April, after the fight in Pleasanton between the defendant and the deceased, and on the same day of the fight, and after the witness Jerd Campbell had told the defendant that the deceased, Peeler, was hunting for a gun to kill him, and of the threat to kill defendant, and that a pistol had been taken away from him by Babe Chapman; that the defendant said to the witness: 'Am

here at this court [referring to the district court then in session at Pleasanton].  I will go and see Avant [meaning Sheriff Avant], and see if I can get off.  If I can, I will go home, because I do not want to have any trouble with the deceased.  I do not care to meet him and want to keep out of his way.'"  To the introduction of this testimony the State objected on the ground that it was irrelevant and self-serving, which objections were sustained by the court, and defendant was not permitted to introduce said testimony.

The court erred in refusing to permit the defendant to prove by the witness A. M. Avant that on the day of the fight between defendant and deceased at Pleasanton prior to the killing and during the term of the district court at Pleasanton, in the first week in April, 1897, that the defendant came to said witness, who was the sheriff of Atascosa County, and told him that he had been summoned as a witness at court, but that he should like for him to aid him in being released, because Jerd Campbell had just told him that deceased, Peeler, had threatened to kill him, defendant, and had tried to borrow a gun to kill him, and that he told said Avant that he wanted to go home to keep from meeting Peeler, because he did not want to have any trouble with Peeler, and that witness told him to go and he would arrange to have him excused, and defendant then told witness that he would go home and stay there, and if they wanted him, to send for him, and that in about one hour after this conversation defendant did go home and remained there.  To the introduction of this testimony the State objected on the ground that the same were irrelevant, hearsay, and self-serving declarations, and these objections were sustained by the court, and said testimony not admitted.

The court erred in refusing to permit the defendant to prove by the witness Leah Harrell, that on the night before the killing of the deceased the defendant told her that he had been to Pleasanton that day to get a witness in his behalf to appear at the examining trial the next day, and that he had requested the sheriff of Atascosa County to be present at his examining trial next day, because Peeler would be there and he wanted the sheriff to be there to keep down any trouble with Peeler, and he did not want any trouble with Peeler, and that he expected to sell out and leave the country to keep from having trouble with Peeler as soon as he was through with his case; that Peeler had filed an affidavit against him, which was to come up in Campbellton the next day.  This testimony was excluded by the court on the objection of the State.

The court erred in its action upon the testimony of the witness Thomas Smith in this:  The defendant proved by said Smith that he, the said Smith, had met the deceased on the road between the towns of Campbellton and Floresville about the middle of April, 1897, and after the trouble between the defendant and deceased at Pleasanton, and that deceased stated to witness that there were two men at Campbellton that had to leave the county, and that W. C. Harrell, the defendant, was one of them, and the deceased asked witness what kind and what was the size of the

gun of defendant; that he, deceased, had bought him a new gun, and said conversation with witness was about two weeks later and before the killing, detailed to the defendant, W. C. Harrell, and the defendant then offered to proved by said witness that he, the defendant, had said to said witness in reply, that the deceased did not have to run him out of the county with a gun; that he was going to sell out and leave the county, and he offered to sell to witness some of his personal property, horses and cattle, and farming implements. The State objected to the admission of the said statement of the defendant, because the same was irrelevant, self-serving, and hearsay, and these objections were sustained by the court, and said testimony excluded. The court erred in refusing to admit the said testimony.

The excluded evidence was admissible for the purpose of proving the state of defendant's mind at and before the homicide. His declarations were verbal acts, showing a mental condition. There were three questions before the jury, and said testimony was relevant to each:

1. Did the defendant act in self-defense, and was his exclamation at the time of the shooting, that deceased had tried to draw a weapon, a truthful expression of the impression made on his mind by the acts of deceased?

2. Did the act of deceased, either in making the demonstration or in walking directly towards the same door as defendant, so that a meeting was inevitable, produce such a condition of mind in defendant as to make the killing manslaughter?

3. Did the advance of deceased toward the same point as defendant, taken in connection with his previous insulting language to defendant's wife, and in connection with his previous conduct and threats, produce such a condition of mind in defendant as to make the killing manslaughter?

The mental condition of the defendant at all times, from the first difficulty to the final meeting, was material to a proper answer to either of the foregoing questions. The testimony was also admissible as part of the res gestae of the homicide. As heretofore stated, the difficulty between the parties began in a fight between them some weeks before the killing, and it ended only with the homicide. The acts of each party, verbal or otherwise, during this time, constitute a part of the res gestae, and throw light on the tragedy and its causes. Gaines v. State, 38 Texas Crim. Rep., 202; Wadlington v. State, 19 Texas Crim. App., 266; Neyland v. State, 13 Texas Crim. App., 536; Williams v. State, 15 Texas Crim. App., 617; Howard v. State, 23 Texas Crim. App., 265; Hobbs v. State, 16 Texas Crim. App., 517; Eanes v. State, 10 Texas Crim. App., 421; Niland v. State, 19 Texas Crim. App., 166; Orman v. State, 22 Texas Crim. App., 604.

The court erred in interrogating the witness Will McAda, by asking him why he did not communicate to defendant certain threats used by deceased in the witness' presence, to which question the witness replied, "that it might make things worse," and the court then asked the ques-

tion: "You did tell him?" To which witness answered, "Yes, sir." And then the court asked, "Did it make things worse?" To which the witness answered, "Yes." To which question, so propounded by the court, defendant objected, because it called for an opinion of the witness, and because it indicated to the jury the opinion of the court and bore upon the weight of the evidence, which objections were overruled.

The court erred in asking the witness E. M. Toms the following question: "Did you ever know of deceased carrying into execution any threats he ever made?" and in permitting said witness to answer said question as follows: "I have known him to make lots of threats he did not execute." To which action of the court in asking said question and eliciting said answer defendant objected, because the answer was a conclusion and an opinion of the witness, and because the court, by its inquiry, indicated that it did not believe that the deceased would execute a threat.

The court erred in its action with reference to the testimony of the witness F. W. Foster, a witness for the defense, as follows: Said Foster testified on direct examination that he had a conversation with deceased, and that deceased had inquired of witness if Harrell was in town, and remarked: "I want to see him up the street here, and I will fix him," and the witness stated that he did not tell Harrell of this until after the killing of the deceased. After cross-examination by the State in regard to the time of said conversation, the court proceeded to interrogate the witness in regard to the time of said conversation; how long he had known of the same; why he did not communicate same to defendant; what induced him to tell defendant, and at whose instance he told defendant; and then remarked to the witness, in the presence and hearing of the jury, as follows: "You knew this was an uncommunicated threat at the time of the killing?" "Yes." "You knew the defendant could not have acted on the said threats at the time of the killing, because he had not heard them?" "Yes." The witness also answered that he was told by Poteet that he had better go to defendant and tell him this, and this was during district court, after indictment in the case. The defendant then asked the court to note their exception to the court's action, because the court was drawing out testimony by asking leading questions—was entering into an argument with the witness, with the avowed object and purpose of discrediting witness. To this objection the court remarked: "Yes, sir, you can have your bill of exceptions. It is not entered into on the part of the court with the avowed purpose of discrediting the witness, but only to get at the true facts in the case," which remark was made in the presence of the jury. To the action of the court the defendant objected, as hereinbefore stated.

The court erred in its action with reference to the testimony of the witness Hinds, in this: Said witness testified to the general reputation of the deceased as that of a violent and dangerous man, and being asked whether deceased was a man that might reasonably be expected to execute a threat, he answered: "I always believed what he told me." The court

then asked the witness the following question: "You mean by that that
he was a determined man, as I understand you, and you always believed
what he said?" The defendant objected to this question, and the court
then remarked, in the presence of the jury: "I want to understand the
witness' testimony; that's what I'm after." Counsel for the defendant
then said: "The court please, that is a matter for the jury to determine."
The court replied: "That is the question I want to find out from the
witness." Defendant's counsel then said: "Witness is asked a question
and his answer is for the jury." The court replied: "The witness can
explain." The court then asked the witness the following question:
"Have you put it on the presumption that he was a violent and danger-
ous man, I want to know. You say you believe what he said?" To which
the witness answered in the affirmative, and stated that if deceased said
he would pay witness one thousand dollars on a certain day, he would do
so, and if he said he would kill me, he would kill me. To all of which
questions and remarks of the court the defendant objected, because the
same was a comment by the court in the hearing and presence of the jury
upon the weight of the testimony. And defendant saved his bill of ex-
ceptions to the said action of the court and the admission of the answer of
the witness. The court qualified defendant's bill of exceptions as follows:
"This bill of exceptions is given with the qualification that the court did
not, and could not, have influenced the jury, because Hinds is a well
known citizen of Frio County, and a credible person, and the jury well
knew that fact, and they were the judges of his testimony as charged by
the court."

The court erred in its action on the testimony of the witness Mrs.
Spivey, in this: On her cross-examination by the State, the following
question was asked the witness: "Did you tell Mrs. Peeler, at her
house, on or about the 23d day of October, that on the day of the killing
Will McAda came to your house in company with the defendant and Joe
Kerr, and that Will McAda had on a pistol, but that it would have to be
dragged out of you?" To which witness answered that she did not make
such statement to Mrs. Peeler. The State then asked: "How did you and
Mrs. Peeler come to be talking about the case?" To which the witness
answered: "I went with her from church, and we were talking about one
thing or another; she was trying to see if she could not pick something
out of me." Thereupon the court asked the witness the following ques-
tion: "What do you mean, Mrs. Spivey, when you say, 'to see if she could
not pick something out of'—you?" To which the witness answered:
"Well, to see if she could not get something to tell." The court then
asked the witness: "Is that your opinion of Mrs. Peeler?" Answer:
"Well, it was not until I found that out." Question by the court: "How
did you find that out?" To this examination of the witness by the court
the defendant objected, because the testimony was immaterial and irrele-
vant. The court replied to counsel: "I do not understand this expres-
sion 'picking things out of people.' It is always supposed they are tell-
ing the truth, and for this reason the court asked for information, and in-

formation only, and in the presence and hearing of the jury." The defendant thereupon objected to the question of said witness by the court and to the remarks of the court in the presence and hearing of the jury, because the remarks were a reflection upon the credibility of the witness, and led the jury to believe that the court did not believe the witness was telling the truth, and because the testimony was irrelevant, immaterial and inadmissible. All of which objections were overruled.

An examination of the statement of facts will show that the court cross-examined nearly every witness for the defendant in such manner as to show a purpose to discredit the witness or to modify the effect of his testimony. Willson's Crim. Stats., sec. 2339, and cases there cited.

The opinion of the witness that the conveyed threats had made things worse was not admissible. One of the vital issues in the case was whether defendant had killed deceased without such cause as to reduce the homicide to manslaughter or justify the killing, and the jury could have drawn the deduction from this witness' testimony that he believed that defendant had killed Peeler because of the communicated threats, and that the homicide was murder. Such an opinion expressed by a witness for the defendant may have materially influenced the jury in their finding. Willson's Crim. Stats., secs. 2502, and cases cited thereunder.

The inquiry, when threats are proven in connection with character, is as to whether the reputation of the party inquired about is of such a character that the defendant might infer therefrom that the threats made would be executed. Testimony that particular threats were not carried into execution throws no light on this inquiry. On the other hand, such testimony might mislead the jury, as they might conclude that the subject of inquiry was not what was the reputation of deceased, but whether such reputation reflected his true character. Willson's Crim. Stats., sec. 1052.

The court erred in permitting the witness W. E. Toms to testify that just before the shooting, when he saw defendant going towards deceased, he pulled his hat over his eyes, because he thought there would be trouble. To which testimony defendant objected, because the same was the opinion of the witness. The testimony referred to in the foregoing assignment is purely the opinion of the witness. The contention of the State was that the defendant shot without justification or excuse, whilst the defendant contended that he did not shoot until a demonstration to shoot had been first made by the deceased. From the opinion of said witness, the jury might have inferred that before the shooting defendant had made some demonstration leading him to believe that he was about to assault the deceased, and this opinion might have weighed much with the jury in considering the issues before them.

The court erred in permitting the State to ask the witness Thomas Smith the following question: "Did you not testify on the habeas corpus trial that everyone knew that deceased shot with his left hand?" To which question defendant objected on the ground of irrelevancy, which objection was overruled, the State's counsel saying that the testimony

was offered for two purposes, first, to test the witness' memory, and second, to attack his credibility; and the court permitted the witness to answer that he did so testify, and then permitted the State's counsel to show the witness his testimony on the habeas corpus trial, and the witness then admitted that he had testified as claimed by the State; and the court erred in permitting the witness to answer the questions propounded to him and in permitting the State's counsel to contradict him by the record in the habeas corpus trial, all over the objection of the defendant.

The testimony of the witness Smith at the habeas corpus trial was but an opinion and not admissible, and not being admissible as original evidence, it could not be introduced for the purpose of contradicting any statement made at the trial to the effect that everybody did not know Peeler shot with his left hand, which statement itself would not have been admissible. In fact no testimony seems to have been given at the trial which the statement made at the habeas corpus trial contradicts. On the contrary, the State seems to have asked the witness if he did not give certain inadmissible testimony at the habeas corpus hearing, and, upon his denial, to have shown that he did. In order to prove that the testimony introduced by defendant that Peeler had reached for his pistol with his right hand was untrue, the State had introduced testimony to show that Peeler shot with his left hand only. This testimony was contradicted by the testimony of defendant's witness that Peeler used either hand in shooting. The opinion of the witness Smith, that everybody knew that Peeler shot with his left hand, related, therefore, to a material subject of inquiry in the case, and should not have been admitted, either as original evidence on that inquiry or as impeaching evidence. That it was treated as original evidence is shown by the failure of the court to limit the purpose of the same in its charge.

The court erred in its charge to the jury in this, that it failed to charge the jury the law applicable to impeaching testimony, the defendant having introduced five witnesses impeaching the witness George M. Martin, and the defendant, at the trial of the case, specially excepted to the said charge of the court, because the court failed therein to charge the law on the question of impeaching testimony.

The court erred in its written charge to the jury in this: It charged the jury among other things as follows: "Every person is permitted by law to defend himself against any unlawful attack reasonably threatening injury to his person, and is justified in using all the necessary and reasonable force to defend himself, but not more than the circumstances reasonably indicate to be necessary. Homicide is justified by law when committed in defense of one's person against any unlawful and violent attack, made in such a manner as to produce a reasonable expectation or fear of death or some serious bodily injury. If you believe from the evidence, beyond a reasonable doubt, that the defendant, with a deadly weapon, or instrument reasonably calculated and likely to produce death, by the mode and manner of its use in a sudden transport of passion, aroused without adequate cause, and not in defense of himself against

an unlawful attack, reasonably producing rational fear or expectation of death or serious bodily injury, with the intent to kill, did shoot with a pistol and thereby kill said T. M. Peeler, as charged in the indictment, you will find him guilty of murder in the second degree, and assess his punishment at confinement in the State penitentiary for any period that the jury may determine and state in their verdict, providing that it be for not less than five years." The defendant at the trial of said cause excepted to the said portion of said charge, upon the ground that the same was not the law applicable to this case, in that it permitted the jury to convict the defendant if from the jury's standpoint there was no actual danger to the defendant, and not from the defendant's standpoint; and further because the jury were misled by said charge into the belief that in order to acquit the defendant the testimony must show that he was defending himself from the jury's standpoint against an unlawful and violent attack against the defendant, made by the deceased, and because said charge is not the law applicable to this case, in that it requires the jury to consider not apparent danger as it appeared to the defendant at the time of the homicide and from the defendant's standpoint. These exceptions of the defendant were disregarded, and said charge given to the jury by the court.

The court erred generally in its charge, in this: That in defining self-defense it limits the right to defend against an unlawful and violent attack made in such a manner as to produce a reasonable expectation or fear of death or some serious bodily injury, and disregards in this portion of its charge the right of the defendant to act upon his belief that an attack was about to be made upon him, or was being made upon him, by the deceased, and in the same connection charges the jury that if the defendant killed the deceased in a sudden transport of passion, aroused without adequate cause and not in defense of himself against an unlawful attack, etc., then they should find the defendant guilty of murder in the second degree, and the only portion of the charge referring to the right of defendant to act upon the appearance of danger is found in that part of the charge with reference to threats. The defendant by this charge is therefore limited in his right to act upon the appearance of danger solely in connection with the evidence of threats, and if the defendant believed at the time of the homicide that the deceased had used insulting words towards his (defendant's) wife, and that the deceased had heard that defendant had been informed of these words and expected them to be resented by defendant, and made some demonstration indicating a purpose to shoot defendant, and that defendant, believing that he was about to be shot, and that it was necessary to slay deceased in order to protect himself, and did slay deceased, nevertheless he would not, under said charge, be justified in acting upon such appearance of danger unless the jury believed the testimony of the various witnesses showing threats upon the part of the deceased.

The defendant was entitled to have the law and all of the law applicable to testimony given in charge to the jury. To prevent confusion in

the minds of the jurors, each theory of the defense should be separately charged on in such manner that the law applicable thereto could be applied by them to the facts proven in support or denial of each theory. The record does not show that any evidence was introduced showing an actual attack by deceased on defendant. The evidence did show, however, a threatening gesture by deceased, upon which defendant acted in firing the fatal shot. The charge should therefore have been limited to the theory of self-defense relied on by defendant, which involved only the appearance of danger (deceased being shown to have been unarmed and therefore not in position to make, in fact, the threatened attack), and this issue should not have been clouded by a charge upon the theory of actual attack and the rights of defendant if such attack had been made. The defendant had a right to defend himself against a threatened attack as fully as against an actual attack. Under the charge given, his right to defend is limited to an attack actually made, not one threatened. Miers v. State, 34 Texas Crim. Rep., 161; Phipps v. State, 34 Texas Crim. Rep., 560; Reeves v. State, 34 Texas Crim. Rep., 483; Williams v. State, 15 Texas Crim. App., 617; Miles v. State, 18 Texas Crim. App., 156.

Independent of any previous threats, the defendant had the right to act upon appearances of danger. The charge of the court in effect directs the jury to consider the appearances of danger in connection alone with threats. It limits defendant's right of self-defense.

Inasmuch as the record does not show an actual attack by deceased, the charge of the court on that subject must be construed as a limitation on the right of the defendant to act on the appearances of danger. So construed, it made the jury and not the defendant the judges of the reasonableness of such appearances. In addition, the record shows that much had occurred to disturb the mind of defendant prior to the killing. In the difficulty at Pleasanton deceased sought to get defendant's pistol, with the evident purpose of slaying defendant with it. Deceased had insulted defendant's wife, threatened his life, avowed his (deceased's) purpose to drive defendant from the country. He was prosecuting the defendant criminally. At the time of the homicide he was approaching defendant in such manner that they would have reached the same door about the same time when he made the threatening gesture. All these matters were in defendant's mind and he must be held to have viewed the gesture in association with them. The jury should therefore have been clearly charged on this defense, and not misled by instructions such as given by the court.

The court erred in refusing to permit the defendant to prove by the witness Mrs. Spivey that about the 1st of May, 1897, at the home of the witness, after she had stated to the defendant that she had heard Peeler say that he intended to kill defendant, she further stated to defendant "that he had better look out; that Peeler was a bad man, and that he had killed some men, and that he (Peeler) would kill defendant, because he said he intended to kill him." To the introduction of that part of said statement, that deceased had "killed other men," the State objected, be-

cause the said testimony was ex parte, and defendant could not prove Peeler's character by proving specific acts on the part of Peeler. These objections were sustained by the court, and the testimony rejected. Childers v. State, 17 S. W. Rep., 903.

The court erred in its charge to the jury, in this: On the subject of manslaughter it charged the jury as follows: "Manslaughter is voluntary homicide committed under the immediate influence of sudden passion arising from an adequate cause, but neither justified nor excused by law. By the expression 'under the immediate influence of sudden passion' is meant, first, the act must be directly caused by the passion arising out of the provocation; it is not enough that the mind is merely agitated by the passion arising from some other provocation; second, the passion intended is either of the emotions of the mind known as anger, rage, sudden resentment, or terror, rendering it incapable of cool reflection; third, by the expression 'adequate cause' is meant such as would commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection. The following are deemed adequate causes: Insulting words or conduct of the person killed towards a female relative of the party guilty of the homicide."

The defendant at the time of the said trial excepted to said portion of the said charge upon the ground that the same was irrelevant and liable to be misunderstood by the jury, in that it failed to charge and explain to the jury that provocation might arise at another and different time from the time of the killing; and further, the court's charge on manslaughter includes the following paragraph, which is a printed paragraph in said charge, to wit: "No. 1. The provocation must arise at the time of the commission of the offense, and that the passion is not the result of a former provocation," which words are erased only by one line of the pen through each line of said printed matter, and left plainly intelligible and readable to and by the jury, and which paragraph so erased could be read by the jury, and because of the failure of the court, as hereinbefore stated, to charge the jury as hereinbefore pointed out, said erased paragraph was calculated to mislead them into believing that the provocation in this cause must arise at the time of the commission of the offense, and because the said charge on the subject of manslaughter is in the abstract, and it does not specially call the mind of the jury to the law directly applicable to the facts in this case. Notwithstanding said exception to said charge, the court gave same to the jury in the condition shown above.

The court erred in its charge to the jury, in this: It nowhere defines in said charge malice aforethought. Childers v. State, 13 S. W. Rep., 651.

It is evident from the charge of the court that the only fact submitted to the jury as adequate cause to produce the condition of mind necessary to reduce an unlawful homicide to manslaughter was the insulting words used towards defendant's wife by deceased, and the jury were fur-

ther instructed that, in order that this fact should be considered as adequate cause, the killing must occur at the first meeting after the fact became known to defendant. There is nothing in the charge defining what constitutes a first meeting, and the jury could have inferred from the testimony, that inasmuch as deceased had been within a short distance of defendant some little time before the homicide, this constituted a first meeting, whether the defendant had seen the deceased or not. In addition to this, as there were other circumstances in the case, which taken together might have constituted adequate cause for the homicide, the charge of the court in singling out one fact alone as constituting adequate cause excluded from the jury the consideration of any of the other circumstances, which, taken together with the insulting words, might have constituted adequate cause under the peculiar facts of this case.

This brief was supplemented by a very earnest and able argument upon the proposition, that the verdict was not supported by the law and the evidence.

*W. W. Walling* and *Mann Trice*, Assistant Attorney-General, for the State.

HENDERSON, JUDGE.—Appellant was convicted of murder in the second degree, and his punishment assessed at confinement in the penitentiary for a term of thirty years; hence this appeal.

The homicide occurred in Atascosa County, at a little place called Campbellton, on the 18th of May, 1897. The venue was changed to Frio County. The testimony on the part of the State showed that bad blood had existed between the parties for some time prior to the killing. On an occasion about a month before the homicide occurred, appellant and deceased met at a saloon in Pleasanton, and an altercation occurred, in which the deceased was assaulted by the defendant, and beaten over the head with a pistol. A severe wound was inflicted on his forehead, the flesh being cut immediately over his eye. From this and other wounds the deceased bled profusely. He escaped from the defendant, and after this the feeling appears to have been intensified. It appears that a school house in the neighborhood was burned, and defendant charged this upon deceased, against whom he made an affidavit for arson. On the trial of said charge, deceased was discharged, and then made an affidavit against defendant before the justice of the peace at Campbellton for malicious prosecution.

The case was set for trial on the evening of the 18th of May, 1897, and the parties were in attendance at Campbellton on said day. Defendant and his relatives, the three McAdas, went from the home of the former to Campbellton. The testimony showed that they carried arms in the wagon, and arrived at Campbellton some two or three hours before the deceased who came in the evening on horseback, unarmed, and arrived about a half hour before the homicide occurred. He hitched his

horse a little north of the store where the court was to be held. The testimony of the State tends to show that he proceeded from there towards the store, and was in full view of the defendant, who was on the street, some thirty or forty feet distant. In a short time, the court was called, and deceased proceeded towards the courtroom. Appellant, about the same time, started to the courtroom from an opposite direction, and intercepted deceased near the sidewalk of the old storeroom where court was to be held. Deceased turned his head in the direction of defendant, and defendant shot him, the ball entering his forehead. He fell with his head on the rock pavement. Defendant backed off from him, and was arrested in a few moments by Sheriff Avant, who came out of the courtroom. One witness for the State testified that immediately after the shooting he heard defendant say, "That's the way you intended to do me." Avant testified for the defendant that, when he came out and approached defendant, he said he shot deceased because he made a motion as if to draw a gun. Two or three witnesses testify for the defendant that at the time of the killing, and before defendant shot deceased, they saw deceased make a motion with his right hand as if to draw a pistol. The State's witnesses controvert this, stating that he made no demonstration whatever; that he had his hat down over his face, and was walking with his eyes and head downward, and evidently did not see the defendant until he was confronted by him, and was immediately shot down. The defendant proved a number of threats by the deceased to take the life of the defendant, most of said threats being of recent origin; that is, since the charge of burning the schoolhouse, and the assault made by defendant on deceased at Pleasanton, but some of said threats were more remote in time. Some of said threats were communicated to appellant, and some were uncommunicated. It was also shown by the defendant that, about a month or six weeks before the homicide, the deceased, in connection with the threats against defendant, also denounced his wife as a whore, which threat and insult were communicated to defendant by the witness McAda on the evening before the homicide. The wife of the appellant also testified that, about eleven years before the killing, deceased came to her house, in the absene of her husband, and cursed and abused her husband, and cursed and abused her; that she only communicated this matter to defendant on the night before the homicide. It was also shown by a number of witnesses for the defendant that deceased was a dangerous man, and one likely to carry out a threat made by him. The State, in rebuttal of the demonstration with the right hand testified to by the defendant's witnesses, showed that the deceased did not use his right hand in shooting a pistol at all, but used his left hand exclusively for that purpose, and that this habit was known to the appellant. This testimony, however, was controverted by the appellant. The State also rebutted appellant's testimony in connection with the insults to the wife of the appellant, by testimony tending to show that appellant was in proximity to deceased a little while before the homicide, and before the fatal meeting, and must have seen deceased. This was sub-

stantially all the facts adduced.  The theory of the State was that the killing was unprovoked, and was done upon malice, and was either murder in the first or second degree.  The theory of the appellant was that the killing was done in self-defense; that deceased, just before he was shot, made a demonstration as if to draw a weapon, and this, in connection with the bad blood existing between them, and the threats made by deceased against his life, was sufficient to induce him to believe that his life was in danger, or he was in danger of great bodily harm from an assault then being made, or about to be made, on him by deceased; that, under the circumstances, he had a right to kill him.  He further contended that the homicide, at the most, could be no more than manslaughter, because of the insults to his wife, and that his passion was thereby excited, and that he slew him on the first meeting after such insults had been communicated to him.  We have made this summary of the main features of the case in order to review the questions made by appellant, and insisted upon by him, as being errors which require a reversal of this case.

We will treat the fifth, eighth, ninth, eleventh, and twelfth assignments of error together, as they present the same question in different shapes; that is, they are all assignments on account of the refusal of the court to permit the defendant to introduce in evidence statements made by himself to other witnesses on various occasions.  The fifth assignment is substantially as follows:  Mrs. Harrell testified that, about two months before the killing, she and her husband and family went to church, and the deceased was also there.  After church, she and her husband (defendant) started home in a wagon.  Deceased and two other men, with guns, came in sight about one and one-half miles from the church, coming across the country, and in the direction of the road ahead of the wagon in which the defendant and his wife were traveling.  Defendant had the wagon to turn around, and they went back, and he borrowed a horse from one Roundtree.  This testimony was admitted, and appellant offered to show by Mrs. Harrell in that connection that her husband stated that he wanted to go home another way, to avoid the deceased.  With reference to this particular testimony, we would state that this was no part of the res gestae pertaining to the homicide.  It was sought simply by this declaration of the appellant to prove his reason for returning to the church and borrowing the horse and taking another road home, which, as he stated, was to avoid the deceased.  Evidently, this purpose was made as manifest to the jury by the proof of the acts done as if appellant had been permitted to testify as to his intention.  The jury, if they believed the testimony, could have put no other construction on the act of the defendant than that he was actuated by a purpose to avoid the deceased on that occasion.  And so we fail to see any injury that could have ensued to the appellant by the exclusion of this testimony, even if its admissibility be conceded as a part of the res gestae of the appellant's acts on that occasion.  We would further observe in regard to this testimony that the bill shows no act of deceased or his companions

manifesting a hostile intention towards the appellant on that occasion. So far as we are advised, deceased's mission on that occasion had no reference to the appellant, and was absolutely harmless.

The eighth assignment of error shows that one Jerd Campbell, a witness for the appellant, testified, on the day that defendant was shown to have assaulted and beaten deceased at Pleasanton, that he heard deceased thereafter make threats against appellant, and that he was hunting for a gun to kill him, etc. He communicated these threats to the appellant, and then it was proposed to prove by him that appellant said: "I will go to see Avant [meaning the sheriff] and see if I can get off. If I can, I will go home, because I do not want to have any trouble with the deceased. I do not care to meet him, and want to keep out of his way." Defendant also offered evidence in this connection to show that appellant came to Avant, he being a witness in attendance on the court at that time, and asked to be released, stating that Peeler had threatened to kill him, and had tried to borrow a gun for that purpose, and that he wanted to go home, etc., to keep from meeting Peeler, and that Avant excused him, and about an hour thereafter appellant did go home. On objection, this testimony was excluded, as being irrelevant, hearsay, and self-serving. These declarations of appellant were no part of the threats made against him by the deceased. At most they only showed a fear or apprehension on the part of the defendant on that occasion, which was long before the homicide.

The eleventh assignment of error shows that the appellant desired to prove that, on the day before the trial, he requested Sheriff Avant, of Atascosa County, to be present on the next day, because Peeler would be there, and he wanted him there to keep down any trouble with Peeler, and that he did not want any trouble with Peeler, and that he expected to sell out and leave the country to keep from being troubled with Peeler as soon as he was through with his case. The twelfth assignment of error shows that about a month before the homicide, on appellant being informed that deceased had bought a new gun, and that he had told the witness Smith that Harrell (appellant) had to leave the country, the appellant proposed to prove in that connection that appellant told witness Smith that deceased did not have to run him out of the country with a gun, that he was giong to sell out and leave the country, and he offered to sell to the witness some of his personal property,—horses, cattle, and some of his farming implements. All of this testimony as to what appellant may have said was excluded by the court. It is said that it was a part of the res gestae, as being what appellant should have said when these matters were communicated to him. They were not res gestae of the acts or declarations proven, but merely what appellant should have said to the witnesses when he was informed thereof. So, we fail to see how they were res gestae. It is contended that this testimony would serve to shed light on the condiion of the mind of the appellant at the time of the homicide. Threats are admissible for two purposes: First, if the testimony is conflicting as to who began the violence, or this fact

is in doubt, threats, whether communicated or uncommunicated, are admissible to solve the probability as to who began the violence; second, where the accused relies upon some act committed by his adversary, accompanied with or without words, as an excuse or justification for the homicide, communicated threats are admissible for the purpose of qualifying and intensifying the act relied upon, because the accused has the right to view the act of his adversary in the light of the communicated threats and the character of his adversary. Evidently, what was said or done by the accused when the threats were communicated to him would have no tendency to qualify the act relied upon as an excuse for the homicide. Threats to take life in a homicide case are, as a general rule, admissible, and also the dangerous character of the party making the threats; but we know of no rule which authorizes proof to be made of what the party may have said about the threats, when they were communicated to him. With reference to all of this testimony, we would observe that, even if it be conceded that it was admissible, then we say that its rejection was absolutely harmless. It is said that they would serve to show the condition of his mind at the time of the homicide. The condition of his mind at that time was unquestionably a material issue in the case, and, if it be shown that such testimony would tend to solve any unsolved issue, there might be error. Now, what unsolved issue would it tend to establish? The jury found that he was not of cool and deliberate mind at the time of the homicide, and was not therefore guilty of murder in the first degree. They evidently found that his mind was perturbed and excited on that occasion, for they found him guilty of murder only in the second degree. Consequently, it would have added nothing to the proof made in that regard, which fully served the purpose with the jury to reduce the homicide from murder in the first degree to murder in the second degree. Nor would this testimony have served the purpose of shedding any light on the issue of manslaughter. The jury found the state of mind,—that appellant was not cool and deliberate; but they failed to find that adequate cause existed, and so we do not see how the rejected testimony would have been of any benefit to the appellant on this ground. How as to the issue of self-defense? No matter what was shown as to the condition of the mind of appellant at the time, this testimony would have shed no light on the question as to whether or not deceased in fact made a demonstration against appellant. So, we fail to see any useful purpose that this testimony would have served; and as stated above, as presented, there was no error on the part of the court in the rejection of this character of testimony. It appears to us to be hearsay, and simply self-serving.

During the progress of the trial, the court interfered in the examination of the witnesses, and interrogated quite a number. Appellant objected to this interference on the part of the court, and particularly to his manner of examining said witnesses, on the ground that the questions were leading, and that the method pursued by the court was calculated to indicate to the jury that he discredited the witnesses. The

second assignment of error under this head is based on the third bill of exceptions. Will McAda, a witness for the defendant, had testified to certain threats made by the deceased against defendant, which he stated he did not communicate. The court then asked the witness "why he did not communicate said threats to defendant." He replied that "he did not do so, because he thought it might make things worse." The court then said to the witness, "You did tell him?" to which the witness answered, "Yes, sir;" and then the court asked, "Did it make things worse?" and the witness answered, "Yes." Appellant objected to this testimony, on the ground that it called for an opinion of the witness, and indicated to the jury the opinion of the court on the evidence, and bore upon its weight. The nature of the threats is not stated in this bill, and we are not advised of their character. The threats may have been of such a character and the circumstances connected therewith, as that the witness was authorized to state his apprehension as a reason for not imparting them, and then, when he did communicate them, he may have known that the communication of said threats was the prime cause that made "things worse." In what respect it made them worse, we are not informed. The bill is not full enough. It may be, if we had a full exposition of the matter, that we would be prepared to hold that this testimony was prejudicial to appellant; but as it comes before us, we can not say that it was.

The court asked appellant's witness Tom Smith if he had ever seen the defendant Harrell with a pistol, to which question the witness answered, "Yes." Appellant excepted to this action of the court, because it was an inquiry into the character of the defendant in regard to his habit of carrying a pistol, and as defendant had not put his character in issue, such evidence was not admissible. We do not regard this as evidence of defendant's character; nor are we informed in what connection the court may have asked this question. If we recur to the evidence in the case, it shows that the appellant was a constable, and, as such, had a right to carry a pistol. Aside from this, if the witness had answered that the defendant was not in the habit of carrying a pistol, the fact that he had one on the occasion of the homicide might of itself have been a significant fact against the defendant. We fail to see how this answer could have injured appellant.

Foster, a witness for the defendant, testified on direct examination, that he had a conversation with the deceased, and deceased had inquired of witness if Harrell was in town, and remarked, "I want to see him up the street here; I will fix him." The witness stated that he did not tell Harrell this until after the killing of the deceased. The State cross-examined this witness in regard to the time of such conversation. The court then, over the objections of the appellant, took the witness, and asked him: "Why he did not communicate this matter before the homicide, and stated to said witness, 'You knew this was an uncommunicated threat at the time of the killing?' to which witness answered, 'Yes.' 'You knew the defendant could not have acted on said threats at the time of

the killing, because he had not heard them?' The witness answered, 'Yes.' " This testimony was objected to, because the court had no right to ask leading questions, nor enter into an argument with the witness for the purpose of discrediting him. The threats testified about by this witness could not have materially influenced appellant in what he did, as he was not aware of them until after the homicide; nor would it tend to show that the deceased made the first demonstration to bring on the difficulty, because deceased was unarmed at the time, and evidently not in a condition to have brought on the difficulty with his adversary, whom he knew was armed. It is not shown by the bill that this witness testified to any material fact; and so, if it be conceded that the method of the court in examining this witness was improper, yet no injury is shown to have resulted from the action of the court.

Hinds, a witness for the appellant, testified that the deceased was a violent and dangerous man, and one who might reasonably be expected to execute a threat, and he always believed what deceased told him. The court then took the witness and asked him the following question: "You mean by this that he was a determined man, as I understand you; that you always believed what he said?" The defendant objected to this question, and the court then remarked in the presence of the jury: "I want to understand the witness' testimony. That is what I am after." Counsel for appellant then said: "May it please the court, that is a matter for the jury to determine." The court replied: "That is the question I want to find out from the witness." Defendant's counsel then said: "The witness is asked a question, and his answer is for the jury." The court replied: "The witness can explain." The court then asked the witness the following question: "Have you put it on the presumption that he was a violent and dangerous man? I want to know. You say you believe what he said?"—to which witness answered in the affirmative, and said: "If deceased stated that he would pay witness $1000 on a certain day, he would do so; and if he said he would kill him, he would kill him." The court qualified this bill, but the qualification is of no importance. It will be noted that, whatever was the purpose of the court in examining the witness, the examination only served to fix more firmly the fact testified to by the witness, and he enforced what he meant by giving an apt illustration. The effect of this examination of the witness by the court was to bring out in bold relief the fact testified to by the witness, to wit, that deceased was a man likely to execute a threat he had made. This was not injurious.

Mrs. Spivey was a witness on behalf of defendant, and, on cross-examination by the State, she was asked the following question: "Did you not tell Mrs. Peeler, at your house, on or about the 23d of October, that, on the day of the killing, Will McAda came to your house in company with the defendant and Joe Kerr, and that Will McAda had on a pistol, but that it would have to be dragged out of you?" The witness answered that she did not make such statement. The State then asked: "How did you and Mrs. Peeler come to be talking about the case?"—to

which the witness answered, "I went with her from church, and we talked about one thing and another, and she was trying to see if she could not pick something out of me. Thereupon the court asked the witness the following question: "What did you mean, Mrs. Spivey, when you said that she was trying to pick something out of you?"—to which the witness answered: "Well, to see if she could not get something to tell." The court then asked the witness: "Is that your opinion of Mrs. Peeler? A. Well, it was not until I found that out." The court then asked: "How did you find that out?" To all of this examination by the court the appellant objected. The examination by the State was had for the purpose of laying a predicate for the impeachment of the witness by Mrs. Peeler. It is not shown by the bill that Mrs. Spivey testified to anything material for the appellant, and in the absence of such showing, we can not presume that Mrs. Spivey was a material witness for him. Therefore, if the manner of the court and his asking the questions tended to cast some discredit upon this witness, we can not say that it was injurious to the appellant. Even if it was the purpose of the court to confuse the witness as to the integrity of Mrs. Peeler, it failed in that purpose, for the witness stated that her opinion of Mrs. Peeler was formed from her conduct on that occasion.

With reference to all the bills of exception bearing upon this action of the court, we have to say that, judging by the bills themselves, we can not see how the action of the court was prejudicial to the appellant; but we do say that this conduct of the court, in our opinion, was very reprehensible. Our Code of Criminal Procedure marks out the duties of the court and the respective officers thereof, during the trial of a criminal case; and we do not understand it to be any part of the duty of a judge to take in hand the examination or cross-examination of witnesses. These functions belong to the respective counsel on either side, and it is presumed that they know how to discharge their duties properly. If they do not comply with the rules in regard to the examination and cross-examination of witnesses, it is the duty of the court to see that they do comply. It may be the province of the court to sometimes inquire of a witness as to some statement made by him for a clearer understanding on the part of the court, but it can never pertain to him to interfere in the case, and take the examination of a witness out of the hands of counsel, whose business it is to conduct the examination. As to a matter of this character, the court should studiously abstain from interfering. He should avoid even the appearance of partiality. It would be almost impossible for the court to take part in the examination of witnesses without impressing the jury with the belief that the court believed or disbelieved the testimony of the witnesses, whether the court intended to make such an impression or not. Our Code of Criminal Procedure is very particular in regard to this matter. Article 767 provides: "In ruling upon the admissibility of evidence, the judge shall not discuss or comment upon the weight of the same or its bearing in the case, but

shall simply decide whether or not it is admissible; nor shall he at any stage of the proceedings previous to the return of the verdict make any remark calculated to convey to the jury his opinion of the case." Now, in the examination of a witness, however fair-minded the judge may be, it would be almost impossible for him to so conduct it as not to suggest in some measure that he is on one side or the other. And, moreover, we have noticed that, when the court attempts to thus usurp the functions of counsel, he is apt to ask questions that are leading in character, and that are otherwise objectionable. By carefully attending to his own duties and conserving his own functions, he will best be able to hold the scales of justice impartially as between the counsel who are managing the case for and against the State; and, whenever he does interfere, it is generally at the expense of his own authority and dignity, which should be rigidly guarded, in order that he may administer the law with fairness and impartiality, and with that authority and power which pertains to the office. We can not commend the action of the judge in his attempt to interfere with the province of counsel for the State in the examination of witnesses, and, if it appeared to us that such interference on his part was calculated to prejudice the rights of the appellant, we would not hesitate to reverse this case. Such interference on the part of a judge can never be called for, and especially in this case, where both the State and the defendant were represented by able counsel, it was absolutely unwarranted.

W. E. Toms was introduced by the State, and the court permitted him to testify that just before the shooting, when he saw defendant coming towards the deceased, he (witness) pulled his hat over his eyes, because he thought there would be trouble. Appellant objected to the question because it called for the opinion of the witness; and he objected to the answer when made, because it was an opinion of the witness. Evidently, the community were looking for trouble between the two men when they met, and the fact that, a few seconds after the witness pulled his hat over his eyes, trouble did begin, is shown by the undisputed evidence in the case. The witness did not state that he was looking for one or the other of said men to become the aggressor, and we can not see how the statement made was calculated to injure appellant.

We think it was competent for the State to ask the defendant's witness Thomas Smith, either in order to refresh his memory or to impeach him, if he had not testified on a habeas corpus trial that everyone knew that deceased shot with his left hand. No objection was made that this called for the opinion of the witness, but the objection was merely to the question on the ground that it was irrelevant.

The court did not err in sustaining the objection of the State to the proposition of the defendant to prove by Mrs. Spivey that in connection with the threats she heard Peeler make against the defendant, which she communicated to him, she also told him that Peeler was a bad man, and that he had killed some men. The language of the witness was no part of the language used by the deceased in threatening the defendant. Ap-

pellant had the full benefit of the threat made, and the court did not err in refusing to permit the witness to inject her opinion of Peeler and the fact that he had killed some men. If Mrs. Spivey knew the deceased and his reputation, that could have been proven by her, but this is not the case here presented.

It was not necessary for the court to instruct the jury with regard to the testimony adduced by the appellant to impeach the witness George M. Martin. This was not the case of the State introducing hearsay evidence which involved the statement of a material fact in impeachment of a witness, but it was where the defendant attempted to impeach a State's witness. If the court had charged on this subject at all, it would merely have instructed the jury that certain witnesses had been introduced to impeach the State's witness George M. Martin, and, if they believed that the impeachment had been successful, that then they would not consider the testimony of said Martin; otherwise, his testimony was before them to be considered along with the other testimony in the case. But such a charge can rarely be called for, and, where it is given, great care should be observed lest it be a charge on the weight of the testimony. The failure to give such a charge was not error.

In connection with the charge on murder in the second degree, the court outlined a charge on self-defense. This was evidently given by the court in order to present a charge on murder in the second degree, which is a killing upon malice, not express, and where the homicide is not reduced, excused, or mitigated, and not done in self-defense. This charge is objected to, because it is claimed that it permitted the jury to convict the defendant, if from the jury's standpoint there was no actual danger to the defendant, and not from the defendant's standpoint. In addition to this charge on self-defense, which was given in connection with the definition of murder in the second degree, the court gave a full charge on self-defense, predicated on that phase of the case as presented in the testimony; and in this charge the jury were specially instructed that there need be no actual danger to the defendant at the time of the killing, provided he acted upon the reasonable apprehension of danger as it appeared to him from his standpoint at the time of the killing, and that in such case appellant was in no event bound to retreat in order to avoid the necessity of taking the life of the deceased. This was all that was necessary, and the jury could not have been misled by the excerpt on self-defense, in connection with the charge of murder in the second degree, which is assigned as error.

Appellant also objected to the charge of the court on self-defense, because the same is circumscribed and limited in connection with the charge on threats. This was certainly in accord with the facts of the case as presented in the defendant's testimony. As an integral part of his right of self-defense based on a mere "hip-pocket" demonstration, he introduced threats. These were for the purpose of giving significance to the alleged demonstration, and we are constrained to believe that without the threats, which were abundantly shown by him,

the movement of the hand of the deceased at or about the time of the difficulty could have had no significance.

We can not agree with appellant that any confusion was engendered by the failure of the court to charge actual danger and apparent danger in separate charges. If it be agreed that there was no actual danger, as appellant appears to concede, then the charge in question fully authorized the jury to accord him the full right of self-defense on apparent danger, and we fail to see how he could complain.

The court gave a charge on manslaughter, based on the insults alleged to have been offered to the wife of the appellant, and communicated to him on the night preceding the homicide. The objection to this charge is "that it failed to instruct and explain to the jury that the provocation might arise at another and different time from the time of the killing;" and, further, the court erased from the written charge the following paragraph: "The provocation must arise at the time of the commission of the offense, and that the passion is not the result of a former provocation." This erasure was made by drawing a pen across said clause. This was not read to the jury as a part of the charge of the court, and this is the ordinary way of making an erasure of this character, and it was evidently so understood by the jury. This elimination was intended to meet an objection which might have been urged against the charge had it remained,—that is, that this clause confined the jury to a provocation arising at the time of the commission of the offense; and in that shape it would have been incongruous with that portion of the charge which told the jury that insults to the wife of the appellant, occurring before the homicide, but afterwards communicated to appellant, could be acted on by him at the first meeting, and if, under such circumstances he killed appellant, it would only be manslaughter. See Lawrence v. State, 35 Texas Crim. Rep., 114.

Appellant assigns as error that the court nowhere defines, in the charge given, "malice aforethought." On this subject he refers us to Childers v. State (Texas Criminal Appeals), 13 Southwestern Reporter, 650. We have referred to said case, but do not find the charge given by the court. The court merely says that the charge does not explain to the jury the legal meaning of the term "malice aforethought," and that the omission to give such explanation is not supplied by the definitions of "express malice" and "implied malice" contained in the charge. Crook's Case, 27 Texas Criminal Appeals, 198, is also referred to. The charge is not given in that case. In that case the court says: "In all trials for murder, it is the imperative duty of the court to instruct the jury as to the meaning of 'malice' or 'malice aforethought.' It is fundamental error to omit such instructions, and the definition of 'express malice, will not cure this omission. In this case the charge fails to explain the legal meaning of 'malice aforethought.' " The court here appears to treat "malice" and "malice aforethought" as convertible terms, and this seems to be in accord with Mr. Wharton. See 1 Whart. Crim. Law, sec. 303. Mr. Stephens gives a more extended definition of "mal-

ice aforethought;" or, rather, instead of a definition, he gives illustrations of malice aforethought. In this case the court gave a definition of "malice" as follows: "Malice is a condition of the mind which shows a heart regardless of social duty and fatally bent on mischief, the existence of which is inferred from acts committed or words spoken." This charge has been approved by this court in the case of Martinez v. State, 30 Texas Criminal Appeals, 129, and was thoroughly discussed there, and authorities cited, and we will not enter into any further discussion of the question.

Appellant singles out a portion of the charge on murder in the second degree, and claims that it is erroneous, because it instructs the jury "that, in murder of the second degree, malice will be implied from the fact of an unlawful killing." This is merely an excerpt or a part of the charge on murder in the second degree. When the whole is taken into consideration, it is correct, and the jury could not have possibly been misled.

Nor do we believe that the court erred in failing to give a more elaborate charge on manslaughter than was given. Besides charging on the particular provocation, on which appellant's defense of manslaughter was predicated, he told the jury, in connection therewith, they could consider all the facts and circumstances in evidence in the case; "and if you find that by reason thereof, that the defendant's mind at the time of the killing was incapable of cool reflection, and that said facts and circumstances were sufficient to produce such state of mind in a person of ordinary temper, then the proof as to the sufficiency of the provocation satisfies the requirements of the law, and so in this case you will consider all the facts and circumstances in evidence in determining the condition of the defendant's mind at the time of the alleged killing, and the adequacy of the cause, if any, producing such condition." This was certainly giving appellant the amplest latitude, when really the only factor in the case suggesting manslaughter was the insult to appellant's wife.

We have examined the record carefully, and, in our opinion, the evidence sustains the verdict, and the jury were fully warranted in assessing the punishment which they did. We gather from the record that appellant went to the scene of the homicide with the intent to slay deceased, and the jury were fully warranted in discarding and disbelieving, as they did, the testimony regarding the insults to appellant's wife, or that they were the moving cause to the homicide. Appellant had exhibited his malice towards the deceased on previous occasions. Only a few months before, he had him arrested on a charge of burning a schoolhouse. Deceased appears to have been acquitted of the charge, and, in turn, to have preferred a charge against appellant of malicious prosecution, which was to be tried on that particular day. In the meantime, some months before the homicide, appellant had, on slight provocation, severely beaten deceased over the head with a sixshooter. He appears in all their troubles to have been the aggressor. On the fatal day, deceased came to the place of trial unarmed, and his condition in that re-

spect was observed by a number of witnesses, and defendant, who was within twenty or twenty-five feet of him when he arrived and hitched his horse, must have seen him then and afterwards. Appellant came to the place with guns and pistols in his wagon, and with his three cousins. When court was called, deceased immediately went from the opposite building, where he was standing with the county attorney, Martin, towards the courtroom door. This must have been observed by the appellant, who stood in front of the same building, some twenty steps north of him. He immediately left his place, and started towards the courtroom door, closely followed by one of his cousins, and another was close by. He intercepted deceased when near the courtroom door, and, as the latter turned his head towards him, he appears to have been ready, and immediately fired, shooting him through the brain. A number of witnesses for the State testify that deceased could not have observed appellant while he was en route to the courtroom, as he had his head down, and his hat rather over his eyes. Appellant approached deceased rather to his left. The State's witnesses, some of whom were observing deceased, state that he made no motion or demonstration with his hands whatever. Defendant's witnesses—that is, his two cousins, and perhaps another witness—state that the deceased at this juncture threw his right hand towards his hip. Unarmed as he was, and knowing that his adversary was armed, why he should make this movement is remarkable, unless, on seeing his adversary about to shoot him down, he made some involuntary movement with his hands, just as he received the fatal discharge from appellant's pistol. At any rate, the jury appear to have disbelieved the "hip-pocket" movement, which is so often invoked, and to have adopted the theory of the State, which to our minds appears more reasonable and more worthy of belief, and we do not feel inclined to disturb their verdict. We believe the jury were fairly charged upon all the issues in the case, and that they would have been fully warranted in finding a much severer verdict than they did, for, in our opinion, the record here would sustain a homicide upon express malice. No errors appearing in the record authorizing a reversal of this case, the judgment is affirmed.

*Affirmed.*

[NOTE.—Appellant's motion for rehearing was overruled without a written opinion.—Reporter.]